## (January 8, 1973)

FRANK BLOOM et al., Respondents, v. TOWN BOARD OF THE TOWN OF OYSTER BAY, Appellant, and ROBERT LIEBOWITZ et al., Intervenors-Defendants-Appellants.— In an action for a declaratory judgment, defendant and intervenors-defendants appeal from so much of a judgment of the Supreme Court, Nassau County, entered June 20, 1972, as adjudged (1) that a zoning resolution of the Town of Oyster Bay reclassifying certain real property from H-Industrial to E-1 Apartment House is invalid and (2) that, in calculating the density requirement under the Oyster Bay Building Zone Ordinance with respect to said property, the lot area should only include the buildable portion of a lot. Judgment affirmed insofar as appealed from, with one bill of costs jointly against appellants appearing separately. No opinion. Rabin, P. J., Martuscello, Latham and Shapiro, JJ., concur; Munder, J., dissents and votes to reverse the judgment insofar as appealed from and to declare the zoning resolution valid, with the following memorandum: This case presents an example of the not unique dilemma of what to do with the site of an exhausted sand pit. Typical of sand and gravel mines on Long Island, this one has cut into a hillside, leaving precipitous slopes on the perimeters other than the valley on which an abutting road exists. Fortunately, the floor of the mine remained at the level of that road. The site in question is a 28-acre parcel of land, with a flat area of 15 acres surrounded by three slopes rising to a height of 100 feet. The bases of the slopes, presumably determined by the sharpest angle of repose, occupy 13 acres of the total area. The owner seeks to get the maximum use of the entire area. The neighbors would prefer the minimum use. The governing authority must, and apparently in this case did, elect to balance these interests. Plaintiffs reside in a single-family residential development which is south and east of the subject property. The subject property is on the west side of New York State Route 106, at this point a three-lane highway and the principal north-south route from Oyster Bay to Hicksville. Directly across Route 106 from the subject property is a large sump or recharge basin. North of the sump and on the same side of Route 106 is a shopping center, some of which is opposite part of the road frontage

of the subject property. The development in which plaintiffs live is built on 10,000 square-foot plots. None of the plots which abut the easterly side of Route 106 front on the State highway, access thereto from the plots being by an intersecting road several hundred yards south of the subject property. In this action for a declaratory judgment, Special Term found that on a prior appeal in this litigation we determined that some of the plaintiffs were proper parties (see *Ajamian* v. *Town Bd. of Oyster Bay*, 38 A D 2d 551). Special Term then found the enacted amendment to the zoning ordinance, changing the classification of the parcel here involved from H-Industrial to E-1 Apartment House, invalid for two reasons: (1) the legislation lacked the prior approval of the Town Engineer as required by section E-15 of article VII-A of the Building Zone Ordinance of the Town of Oyster Bay and (2) the approval for 356 dwelling units exceeded the allowable 16 units per acre under section E-9a of article VII-A of the ordinance, since the area covered by the slopes was unbuildable in a practical sense and that area must be excluded from "lot area" as defined in the ordinance. As to the standing of plaintiffs, I would first observe that we did not, in our prior determination, do more than recommend to plaintiffs that they plead in more exact terms their status as aggrieved parties (*Ajamian* v. *Town Bd. of Oyster Bay, supra*). Inferentially, of course, we were also telling them to support the pleadings with proof. The proof in the present record on the issue of status or standing is far from overwhelming. Plaintiffs offered no proof of pecuniary damage and the intervenors-owners' expert testified that, in fact, the rezoning from Industrial to Apartment House use would increase the value of the surrounding property. I do not feel, however, that pecuniary damage is the *sine qua non* for standing. As indicated in *Blumberg* v. *City of Yonkers* (21 A D 2d 886, affd. 15 N Y 2d 791), the right of a litigant to maintain an action for a declaratory judgment declaring the invalidity of a zoning ordinance, or an amendment thereof, is based on the same criteria for the institution of a proceeding under article 78 of the CPLR to review the determination of an administrative body granting a variance. In other words, the litigant need only show that somehow he or his property is especially "affected", or "aggrieved", or has suffered "special damage" (see *Schapiro* v. *Town of North Hempstead*, 35 A D 2d 596; *Daum* v. *Meade*, 35 A D 2d 598; *Marcus* v. *Village of Mamaroneck*, 283 N. Y. 325). At bar, there was some showing that the zoning change would bring an increase in traffic and its deleterious side effects. Thus, though not for the reason that we previously affirmed plaintiffs' requisite status, I would affirm the finding of standing as to plaintiffs. I note, too, that several of the original plaintiffs were held to be without standing by Special Term on the ground they were residents of an adjoining village and could not be heard on a zoning matter beyond their corporate boundaries. I disagree. It seems to me that abutting owners are especially affected and should have standing to test the validity of rezoning legislation notwithstanding that their lot lines form part of the boundary between two municipalities and they live in an adjoining village (see *Matter of Town of Bedford* v. *Village of Mt. Kisco*, 40 A D 2d 979; *Township of River Vale* v. *Town of Orangetown*, 403 F. 2d 684). However, I think the standing of the excluded plaintiffs should be reviewed in a proper case. Here, they have not appealed, so the matter is moot. Going to the merits, I cannot agree with the restrictive interpretation given by Special Term to the ordinance definition of "lot area", which reads: "LOT AREA is the area of a lot on which a building and its accessories may be located, exclusive of land in the bed of any street" (art. I, § 3). Holding that the area occupied by the slopes is not available for building, the court multiplied the allowable 16 units per acre by the number of buildable acres and found a

maximum of 240 units permissible. Therefore the town's authorization of 356 dwelling units was illegal. Apart from the fact that there was no proof of nonutility of the slope area and that modern technology indicates the contrary, and conceding that building on the sand slopes would be impractical and uneconomic, I do not believe that the slope area must be eliminated from consideration. The ordinance itself suggests the contrary when it provides that "the total building area shall not exceed twenty (20) percent of the total lot area" in an E-1 Apartment House District (§ E-9). There is nothing in the ordinance which requires that the 80% remaining must be buildable. Nonbuildable land may be available for yard setbacks or such other open areas as the ordinance may require. The sterilization of almost one half of the total acreage in question borders on an unconstitutional confiscation. I am troubled with the remaining question of whether there was compliance with section E-15 of the ordinance, which provides that no property shall be classified E-1 Apartment House District "until after evidence satisfactory to the Town Board demonstrates that the system of sewage disposal for such apartment house has received the prior approval of the Town Engineer." It is suggested by the intervenors that since the State has pre-empted the field of regulation of sewage disposal systems for apartment houses, the ordinance provision requiring the prior approval of the Town Engineer is no longer useful or vital to an ordinance amendment establishing an Apartment House District. The Town Attorney takes the position that section E-15 has vitality and its requirements must be met. With this latter view I agree. At the trial, a deposition of the Town Engineer was received in evidence. From that, the court concluded that the provisions of section E-15 were not complied with. This witness, who had left the position of Town Engineer only days after the questioned enactment, was not before the trial court. In reaching its conclusion Special Term relied upon portions of the engineer's testimony in which he indicated that he did not discuss the sewage disposal system with the Town Board before the hearing and that he did not tell them whether or not he approved it. My own reading of the engineer's testimony discloses that he was vague and unsure about the matter. He remembered discussing the sewage disposal question in "one of the offices of the [Town] Councilmen". He visited the site and remembered making some computations relative to the slopes and the sanitary sewers, but, to use his own words, "for the life of me I don't remember how it came out. I don't remember if it was positive or negative [i.e., whether he approved it or not]." He was sure, however, that the meeting in the Councilman's office had occurred and the calculations made *before* the hearing at which the Town Board acted. As for the form which his reports took, he testified as follows: "In some cases it could be oral, and in some cases it could be in writing. If I was asked specifically to put it in writing for the record, I would do it. If it was just an informal discussion, relative to engineering data on a particular problem, it could just be reported back to one Councilman, who would be, say, if it's the North Shore area you would report back to Councilman Christ, maybe, or the Hicksville area you would report to Councilman Doolittle. It could be either in writing or verbally." At the time of his examination the engineer was ill and distressed. He had not checked his files on the matter. The following excerpt is revealing: "No, I haven't had time. I have been laid up for the last month and this is all pretty fast for me right now. I haven't had time to even think back a couple of years as to what really happened. MR. COTTER: I understand that, and we appreciate your coming today. We are under pressure from the Court to complete the trial by next Wednesday, so we are having to do this, even though it is so close to the time you have left the hospital, and we apologize for that." In

contrast to the engineer's uncertainty, we have the unequivocal testimony of two Councilmen, Christ and Diamond, both attorneys, who appeared before the court. Councilman Christ indicated that between the public hearing concerning the zoning amendment, which was held in January, 1970, and the Town Board meeting in December, 1970 at which the amendment was enacted, the Town Engineer advised him that the site in question was adequate to accommodate the sewage. As was the custom, he (Christ) was the member of the Town Board who rode herd on this particular matter because he lived in the particular part of town which was affected. He did not ask the engineer for a written report. Both he and Diamond testified that *before* the vote was taken, the engineer assured them that there was no problem with respect to sewage disposal. Diamond further testified that "there is absolutely no question in my mind that, compared to what exists there now or would continue to exist as an industrial park [*sic*], would be enhanced a millionfold if the restrictive covenants which we placed on the approval of this application came into being * * * [and] with the tremendous need that we have in the Town of Oyster Bay for garden apartments, if we are not going to put it in the sandpit, then, for heaven's sake, where are we going to put it?" From the above, I conclude that section E-15 of the ordinance was satisfied. It requires, and I think this is significant, that evidence of the Town Engineer's approval be "satisfactory to the Town Board." Here, the Town Board was aware that the engineer's prior approval was required. They were reminded of the fact immediately before the vote. The board was advised by the board member responsible for this particular matter that such approval had been received. At least one of the other board members was personally aware of the approval. Since there was no requirement that the approval be in writing, the board could be "satisfied" with an oral assurance, particularly when they knew the physical (sandy) makeup of the site and knew that the number of apartment units was considerably less than the number for which approval had originally been sought. Since we are reviewing a legislative act, and since the amendment in question is an upzoning which obviously will enhance the aesthetic and pecuniary value of the area in question, and since the legislative body has complied with the statutory requirements, I vote to uphold the amendment in question.